CATHARINE HARRIGAN *v.* CITY OF WILMINGTON.

*Municipal Corporation—Construction of Sewer—Negligence—Damages.*

Neither a municipal corporation nor its officers are liable for errors of judgment in deciding upon the plan of an improvement, such as a sewer, where competent persons have been consulted, and their opinion followed.

Neither a municipal corporation nor its officers are bound to take scientific counsel before ·undertaking the construction of a sewer, etc.; but if any mistake be made which might have been avoided by due care in taking advice, the city would be liable, unless the presumption of negligence thus arising were rebutted.

A municipality will be liable for the flooding of private property by a sewer, if such sewer was of insufficient capacity to carry off the water brought to it by another

sewer, together with the adjacent surface water, provided the municipality had actual or constructive notice of the insufficiency of the sewer, or the sewer had been negligently permitted to become choked, and the rainfall which occurred at the time of the flooding of the premises was one of such a kind as might be expected occasionally to occur.

A municipality is not liable, however, for injuries caused by overflow from a sewer, caused by an unusual rainfall, greater than, from past experience, might have reasonably been expected.

(*New Castle, February 21, 1888.*)

ACTION FOR DAMAGES for injury to property, caused by the overflow of a city sewer.

The questions presented are stated by the Court.

*Bird & Bradford,* for plaintiff.

*J. Frank Ball,* for defendant:

The City of Wilmington has the entire jurisdiction and control within its limits of the drainage thereof, which includes artificial as well as natural watercourses.

Rev. Code, p. 443–4, chap. 73, § 99.

The city has also entire jurisdiction and control over the streets and public highways.

Rev. Code, p 415.

The city is not liable for any defect or want of sufficiency in the plan of sewerage or drainage adopted, nor for the insufficient size or want of capacity of sewers, gutters or inlets. This law applies to the present case where the city, in the exercise of its lawful authority, constructed the sewer in pursuance of a plan furnished by its skilled engineer.

2 Dill. Mun. Corp. p 1072, § 1046 ; *Magarity v. Wilmington,* 5 Houst., 530 ; *Clark v. Wilmington,* 5 Harr. (Del.), 243 ; *Mills v. Brooklyn,* 32 N. Y., 489 ; *Wilson v. Mayor etc., of N. Y.,* 1 Denio,

595; *Flagg v. Worcester*, 13 Gray, 601 ; *Barry v. Lowell*, 8 Allen, 127 ; *Child v. Boston*, 4 Allen, 41.

The city is not bound to protect from surface water property below the street level or to adopt a system of drainage for its relief.

2 Dill. Mun. Corp. § 1042; p 1069 and authorities *supra*.

It is the right and duty of such property owner to take such measures as will be necessary to keep the surface water away from his premises.

2 Dill. Mun. Corp. §§ 1040, 1044 ; and authorities *supra*.

COMEGYS, J., (charging the jury.) There have been two cases tried in this court which involve the question of the immunities and liabilities of this city in the exercises of functions under its charter with respect to its streets, which includes grading, making culverts, sewers, etc., and in one of them the diversion of a watercourse from its natural channel into an artificial one, to-wit, a sewer. In both those cases it was decided in effect that the corporation was not liable for any want of proper judgment in the plan of a sewer, or that of any other improvement. The function of deciding upon the proper course to be taken in making an improvement was held to be in fact a judicial one, as involving discretion ; and, the exercise of discretion being an operation of the mind, it is in fact a mental conclusion, and therefore one of judgment. Now, it is unquestionable law that no one clothed with discretionary power over a subject is to be held liable for a mere mistake of judgment in the exercise of it. Were the law otherwise, the greatest injury would result to perfectly honest persons, whose judgment might, in the main, with respect to that and other subjects, be generally correct. All our overseers of roads are clothed with the same sort of discretion, generally speaking, with respect to the common roads, that the city of Wilmington is with respect to the streets thereof. It is true, the overseers have no authority, by virtue merely of their office, to make culverts or sewers, but they are frequently clothed with such by the Levy Court. When conferred, the decision as to the size of

them, and the place where they shall be located, is a discretionary, or a judicial, or *quasi* judicial one.  If the overseer should make a mistake or error of judgment in the provision, he would be free from personal liability; and, if the county could be sued, it would not be liable for his want of judgment, if reasonable care and pains had been taken in selecting him for the service.  The city of Wilmington can by itself (it being a mere public corporation or municipal body) do nothing towards deciding upon or making any improvement whatever.  It acts, however, through agents in making its decisions as to action; but they are chosen by the inhabitants who are voters therein, as citizens thereof.  It is they who represent the city, exercising its public functions through their own discretionary judgment.  They are not liable for any error of judgment merely in deciding upon a plan of improvement, nor is the city,—especially as the city charter provides for the appointment of an engineer in chief to devise all the means for carrying such improvement into effect.  I do not mean to say that the city would enjoy an immunity from liability if the means adopted to make an improvement—for instance the building of a sewer—were grossly and palpably inadequate for the purpose required, forbidding the idea of any sort of reasonable care and diligence; but that it is absolutely free from such where reasonable pains have been used to ascertain the best course to be taken.  In the absence of proof to the contrary, or of such circumstances as compel a different view, the city and its officers must be taken, in any case, to have exercised the best judgment they were capable of.  Such being the case, it results that, if the city made any mistake with respect to making the Adams street sewer, or collecting the waters that had theretofore passed down the Norris brook, or run into it, it must be held to be one of judgment merely, imposing no liability on the city for the mistake made, if in fact any were made at all.  But I wish the jury to understand that what has been said with respect to immunity of the city from responsibility for error of judgment is meant to be confined to cases where competent persons—for example, a

city engineer—have been previously consulted, and have given an opinion which has been followed. But where the city authorities have not followed the advice of such engineer, or have not applied for it all, but have acted upon their own judgment, as they have the right to do, they—that is, the corporation whose affairs they are—must take the consequences of their mistake or error of judgment, if such there shall be found to have been. That is to say, neither a municipal body, nor its officers, are bound to take scientific counsel before they undertake to build a sewer, change a water course, collect water in a confined conduit, etc., but if any mistake be made which might have been avoided by due care in taking advice prior to the act, as should have been done, and following it, the city would be liable. There would, in such case, be *prima facie* negligence on the part of the city ; but like all mere presumptions, it would be liable to be rebutted by proof that damage claimed to have resulted from such imputed negligence did not, in fact, arise from it at all. Therefore, in this case, if the jury should believe that the engineer-in-chief of the city at that time advised against making the Adams street sewer where it was afterwards built, and yet the alleged damage to the plaintiff did not ensue from such a location, the plaintiff would not, because of disregard of such advice by the city simply, have any right to recover for such damage. Though the location was against the engineer's advice, yet it is testified to by Mr. Robinson, the present officer, that the plans of the sewer were made by such former engineer. Therefore the only mistake with respect to that sewer that the city could be held liable for would be its location, and not its size, which was followed from the plans of the late engineer.

   I have heard no evidence tending to show that the alleged damage to the plaintiff was owing to the location of the Adams-Street sewer, but it has been assigned to other causes, which I shall now proceed to consider. One of the causes is that the Reed-Street sewer had not sufficient capacity to vent the water which in time of heavy, unusual rains, would be poured upon what I will call the "Har-

rigan Block," (that is, the block between Monroe, Reed, Adams, and Front streets,) by and through the Adams-Street sewer. The other (or rather the reason advanced for the volume and velocity of of the water passing down by that sewer) is that such were greatly enhanced by drawing the water out of the Montgomery lot, (opposite the Harrigan block, on the north side of Front street,) and emptying it into such sewer. The object of making all sewers is, primarily, to collect waters when they are upon the surface naturally, —that is, in a relatively wide space,—and confine them in the small one, of a pipe, or tunnel, for transmission to their ultimate destination. The right to do this is unquestionable; and if it be exercised with proper care and diligence, no responsibility can result therefrom. The simple question with respect to that, then, would seem to be whether the sewer was adequate to the service to which it was put. If so, no one would have cause to complain. Inadequacy would necessarily be potent or evident to the the most ordinary observer. There is before the jury some evidence of such inadequacy given by one or two of the plaintiff's witnesses; one of them being John Neylor, testifying with respect to the character of the storm which occasioned the damage sued for in this action. He states that the water seemed to come out of the inlets to the sewer at Front street, as well it might when the character of that storm, as spoken of by witnesses on both sides, is considered. There is no evidence, so far as I am aware, except that given by these two witnesses, of any failure of the Adams-Street sewer to flow through it all the water that passed into it on that occasion; nor that it was so full at any time during the storm that it could not receive all that sought passage down the street by its means. There was, therefore, if I am correct in this,—and you are to judge of that,—only this evidence of any engorgement of that sewer by withdrawing the water that would otherwise stand upon the Montgomery lot into it; nor is there any proof, of which I have notes, that such sewer was not in good condition for receiving water at the time this rain of July, 1885, fell. Here, then, is apparently reasonable ground to

10

determine that no mistake was made by the city in the size of the Adams-Street sewer for such service as might be anticipated ; but if you think any was made under the circumstances, (that is, in the exercise of valid power in pursuance of duty,) it was one of judgment merely, for which no liability fell upon the city. Any error that might have been originally, was—though not exactly like one made by the Court for the trial of causes between man and man, (and such are by no means unusual,) but of the same nature—*quasi* judicial, as has been before said, and irremediable by any proceeding against those committing the error. We have, then, so far as the locating, planning, and making the Adams-Street sewer simply are concerned, a perfectly valid exercise of power by the city, under its authority of drainage, which is inclusive, also, of the right to collect the surface water from the Montgomery lot, and discharge it, with the other water collected, through the said sewer. I think this cannot be gainsaid ; for it was admitted in the argument by the learned counsel who opened for the plaintiff that no more water was thus concentrated into that sewer than (before any sewer was made to carry it) passed away by its natural flowage from that lot into and upon the Harrigan block. There was no evidence that any other water passed out of the sewer into and upon said block than such as would have gone through if no improvement whatever had been made, except such as would have remained on the Montgomery lot as a residuum after the surface drainage stopped, whatever quantity that may have been. The latter is all the excess of water diverted into the Adams-Street sewer by the act of the city ; for, of course, at all times when there was a heavy fall of water in its neighborhood, the Montgomery lot, when full, would overflow, and discharge its excess of waters into the same channel which had always carried it down the stream through the Harrigan block. It follows, therefore, that the plaintiff in this action would be without any case in this court, unless she could show something more than the simple collection of all these waters into the Adams-Street sewer, and emptying them upon the block ; because they have always gone

there before; nay, they had, joined with them, the whole flowage of Shipley run, also a much larger stream and channel, which, by action of the city, had, in the year 1873, been turned away from the old place of junction with the waters with which we are now concerned, and made to take a course down Monroe street, in a sewer constructed for the purpose. The plaintiff contends that she has shown that something, and that it is this: That the concentration of the waters originally flowing on the surface of the ground in the rivulet through and under Front street upon the block upon which her tenement is, has operated a greater discharge of water upon that block in a given time, whereby the Reed-Street sewer, at the south side of the block on that street, is inadequate to vent such water, which consequently at the time of the storm of July, 1885, was set back and overflowed her premises,—a part of said block. If it be true that the making of the Adams-Street sewer, and the collection of the surface waters usually flowing down the little run from the Norris spring, and those held in the Montgomery lot after drainage by the old channel, were the cause of her injury, by reason of greater flowage upon the block in the same time than there was before, then the city would be liable, provided that it has been shown by the proof to your satisfaction that such had been the effect of the concentration and discharge upon the Harrigan block before the storm of 1885, and that the authorities of the city were notified thereof.

Testimony has been offered on the plaintiff's side of such effect and notice, which the other side has produced testimony to meet. The value and weight of the testimony are for your consideration and determination only. One thing is certain, from all the testimony, that the ground all about Front and Monroe and Adams and Reed streets was very low; and of course must have been liable at all times, before as well as after the building of the Monroe Street, Adams-Street, and Reed-Street sewers, to overflows of water in time of heavy rains, the same as other like lands. The block, as a plot of ground, has been particularly described by several wit-

nesses.   You have seen, in the review you were sent to make, exactly what it is now ; and your experience and observation of lands similarly situated will instruct you what it must have been originally.   We then come to the question which seems to lie at the foundation of this claim :   Was the plaintiff's property ¡injured as described, by reason of sending the water (which otherwise would have gone upon the block from surface flowage from above by the old culvert under Front street) through the Adams-Street sewer, with the addition to the volume of such water as remains usually upon the Montgomery lot ?   In other words, would that water alone, by reason of its concentration into the Adams-Street sewer, and precipitation at one point upon the block into the old channel, (for there it was emptied,) be sufficient to overflow said block, and do the damage to the plaintiff's property which has been described ? You have heard the Reed-Street sewer as well as the Adams-Street sewer described as to capacity for discharge.   Both of them are parts of a single system, or branch ; and without any proof it would be entirely unreasonable to infer that the Reed-Street sewer was intended at least to be of quite equal capacity of ventage with the Adams-Street end, because it was lower down stream.   By the plot in evidence it appears that the Harrigan block is 230 feet long from east to west, and 110 feet deep from north to south.   At the mouth of the Adams-Street sewer (which is on the south side of Front street and north side of the block) the present elevation at the top above mean low water in the Christiana is 17.87 feet, and at the bottom, 12-44 feet, giving a height in the clear of 5.43 feet. At the mouth of the Reed-Street sewer the elevation at the top is 17.54 feet, and at the bottom 11.44, giving a height in the clear of 6.10 feet, or 8 inches more than the Adams-Street sewer. The difference in elevation of the bottom of each respective sewer is just 1 foot in favor of the Adams-Street sewer.   The city engineer, Mr. Robinson, in his testimony, gives the size of the Reed-Street sewer to be $7\frac{1}{2}$ feet in the clear, from bottom to top arch ; and each of the twin parts of the Adams-Street sewer to be, at construction, and to

have been at time of storm in 1885, 4 feet wide to bottom arch, and 3 feet 3 inches in height. This would make an orifice, or opening surface,—allowing the bottom to be horrizontal and the height 4 feet 3 inches,—of 34 feet, while upon the same mode of calculation the Reed-Street sewer mouth would have an orifice of 45 feet. If these respective orifices were upon a level, therefore, and the water discharged by the Adams-Street sewer had no more than one foot of face in reaching its mouth, the Reed-Street sewer, when full, would so back up the water upon the Adam-Street sewer as to fill its mouth also, and neutralize the effect of the advantage the upper sewer had by reason of the one foot higher level, about it, of its supply. As fast, therefore, as one discharged, the other would receive and pass away. But the Adams-Street sewer in point of fact received a portion of its supply from a much higher level than one foot, though the bulk of it, taking the Montgomery-lot pond as forming part of that supply, must have come from a level not so high.

Now, with this *data* before you, you have the means, to some extent, of determining whether the flooding of the plaintiff's house was caused by the inefficiency of the Reed-Street sewer for the service it was built to perform. In deciding that question, with the flooding of the Harrigan house before you, you should take into account some other facts testified to in the case, including the alleged obstruction for want of due attention of the Reed-Street sewer. The elevation of the building line (if I am right in using such an expression) at the north-west corner of the Harrigan house, on Front street, was and is 20.11 above the mean low water of the Christiana, which is about 6 feet below mean high water, by the testimony of Engineer Robinson. The top of the arch of the Reed-Street sewer is 15.44 feet above such mean low water; therefore the arch of the sewer, at its top, is nearly 5 feet below the said building line at the north-west front of the Harrigan house; about 3 feet from the ground at the south-west corner; and nearly 2 feet at or near the same corner of the back building. This the plot

shows. The cellar windows under the front of the house were proved by the witness Mrs. Russell to be 6 or 8 inches below the pavement. We have no proof of the height of the others above the ground, and I will assume they were upon the same level. However, as you have been to the premises, and reviewed them, you can set me right in making up your judgment about all these matters, if I am wrong. Now, if the windows were of the same height or level all around, and there were no other openings or inlets for water besides those windows, then before water backed up by the Reed-Street sewer could enter there, such water must have risen as much higher than the top of the orifice of the sewer, or highest point of the arch, as is the above-stated difference between the level of the elevation at the building line at the north-west corner above mentioned of the Harrigan house, or the bottom of the cellar windows, if lower, and the summit of said arch. The plot shows that level to be about 4 2-3 feet. Mrs. Russell, daughter of the plaintiff, and one of her witnesses, testified, in describing the state of things, that the Reed-Street sewer was full, and would not vent the water. The witness John Neylor, on the same side, swore that the water was, on a level, above the top of the Reed-Street sewer. These are, I think, the only witnesses who speak of the aspect of affairs at the Reed-Street sewer on the July day, 1885. I have before pointed out that by the plot exhibited to you the top of the arch or orifice of the Reed-Street sewer, not far below, is 5 feet below the elevation at the surface corner of the Harrigan house. Now, with this fact in your mind, (and which no doubt you observed at the review,) you can easily decide whether the water, which no doubt did enter the plaintiff's house, and did cause damage thereby, came from or was caused by backing up from the Reed-Street sewer, as claimed by the plaintiff. If the witness Neylor is correct in his statement, (he is, as you remember, a witness for the plaintiff,) and the water on the block was, as he said, on a level, about the top of the Reed-Street sewer, then it must have been about 2 feet below the lowest elevation given on the plot of the

land around the Harrigan house.   Mrs. Russell says the sewer was
full to the top; she and Neylor therefore agree in that respect; but
the latter does not say it would not vent, as she does.   There would
apparently be a mystery how the water, only on a level, according
to Neylor, with the top of the Reed-Street sewer, could have
flooded the Harrington house cellar, when the lowest ground around
the house is say 2 feet, by the plot, above the top of the Reed-Street
sewer arch.   But we are not without other light on the subject of
the flooding.   There is testimony before you, coming also from the
side of the plaintiff, the witness being Mr. Neylor, that the water
rose to the height of 14 inches in the plaintiff's parlor, and that the
door-sill to the house in front was 12 inches above the pavement.
This statement is entirely consistent with the injury alleged to the
furniture on that floor.   Now, taking the elevation I have given
from the plot at the corner of the Harrigan house, as that above the
top of the Reed-Street sewer is about 4 2-3, the water must have risen
between about 6 and 7 feet above the top of the Reed-Street sewer
arch, to have attained such a level, and backed the water up in the
Adams-Street sewer so as to prevent, it would seem, any ventage by
it into the Harrigan block.   Where, then, can this water have
come from?   All admit that the July, 1885, storm was a heavy
one.   Looking at it from any point of view, it must have been a
severe one.   Some of the plaintiff's witnesses testified that there
had been such before, and one said there had been one equal to it
since.   It is undisputed that the flow of water down Front street
to Adams was such as to sweep in its track and carry along a great
deal of sand and rubbish, and also paving or cobble stones; the
streets were broken up in several places, and washouts were in some
localities.   Mr. Humphrey, one of the defendant's witnesses testi-
fying to the fact of the storm, spoke of it as having lasted about a
half hour, and in that time 2 inches of water fell. The newspapers
offered in proof do not give such an amount of rain for the time.
According to the Every Evening, or rather the account given by
its reporter, $1\frac{3}{4}$ inches of rain fell, and the storm lasted 33 minutes.

It is for you to say which statement you must rely on, that of the newspapers or that of Mr. Humphrey. They are, for all necessary purposes, the same. Unquestionably a great deal of water fell. It would seem reasonable in view of this testimony, and you may so think after considering the subject, that the water got in by reason of the great rise in the street, proved by the plaintiff's witnesses. If this be a satisfactory view to take, in your judgment, then it was not by reason of any obstruction (if there were any) in the Reed-Street sewer, by rubbish, or sand and other filth, that the flooding of the house occurred, but because of the great rise that inundated the streets and sidewalks,—for a great rain it was, by all accounts ; in fact, no one equal to it is reported in the work upon the subject of sewers (Adams) which has been produced and read before you. The authority gives lists of 185 and 139 storms, respectively, and only one of them attained the height of 13.15 inches per hour. This storm may be considered an excessive one. The author of the work states that no system yet proposed in any city contemplates the removal of excessive storm waters by means of the sewers alone,—such storms, for instance, as discharge in short intervals, 2 or 3 inches of rain in the hour. P. 30 N.

In calling your attention to certain points in the testimony in this case, I have not intended to express any opinion of my own with respect to their bearing upon the main question at issue between the parties, but only to recall to your minds facts which I deem it important you should have in mind in the formation of your verdict. Wherever there is discrepancy in the statements of opposite witnesses in relation to any essential facts, as you may view the case, you must reconcile them with each other, if you can; if you cannot, then you should give your confidence to those of most weight in your opinion. If upon a calm and full consideration of all the testimony of the witnesses, and the facts shown by the plot, and the suggested inferences that may be drawn therefrom, you should come to the conclusion that the flooding of the plaintiff's premises really came from back water caused by the then inability

of the Reed-Street sewer to vent the water poured upon the block by the Adams-Street sewer, and that also which fell from the clouds upon its surface, the plaintiff would be entitled to recover, provided the city has been shown to your satisfaction by the proof to have had actual or constructive notice of the insufficiency of the Reed-Street sewer to promptly discharge the waters sent down it by the Adams-Street sewer, or that the former, though sufficient, was choked at the time by reason of the neglect of the proper parties having the oversight of it, so that it would not, because it could not, vent it, or that the rainfall was of that extraordinary nature which, in the language of one of the authorities cited by the opening counsel for the plaintiff, might be expected occasionally to occur. But if, on the contrary, you should believe from the testimony that the injury was not from insufficiency of such Reed-Street sewer, nor from any obstruction in it owing to the neglect of the city to keep it free, but was on account of the magnitude of the storm discharging a greater quantity of water than might reasonably be expected to occur from past experience, and that it must have vent, then your verdict should be for the defendant.

In considering the question of choking of sewers by sand and rubbish, the jury will, no doubt, bear in mind the fact of common experience well known wherever sewers exist, that one mode of cleaning them is by what is called flushing,—that is, turning into them strong streams of water. It is for you to say, taking all the testimony about the rainfall into consideration, whether obstructions of any kind spoken of could have remained in the Reed-Street sewer after the waters rose up so as to be about even, as the witness Neylor said, with the top of it.

I now commit this case to you, and ask you to carefully consider and weigh all the testimony and facts shown on both sides ; to reflect upon any argument, and review all the testimony the counsel have made or presented to you as bearing upon the question you have to decide, and make such a verdict as shall satisfy yourselves is the only one you can find,—the true one, according to the law and

the evidence.   Should your verdict be for the plaintiff, she is entitled to recover for whatever actual damage her own movable goods suffered from the water; and such sum of money besides as shall be the aggregate of the diminution of the annual value of the house for the period of 13 years from the time of the injury, (26th July, 1885,) with deduction therefrom for taxes, repairs, insurance, and rebate of interest.   This is matter of calculation in the main, which the counsel on both sides will save you the trouble of working out, by doing it for you.

Verdict for the plaintiff.